IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs July 1, 2021

**IN RE EVAN M.**

**Appeal from the Juvenile Court for Anderson County
No. J-27889; 20-0717    Brian J. Hunt, Judge**

_____

**No. E2020-01673-COA-R3-PT**

_____

This appeal concerns termination of parental rights.  The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Anderson County ("the Juvenile Court") seeking to terminate the parental rights of Nicole M. ("Mother") and Joseph M. ("Father") to their minor son Evan M. ("the Child").  After a hearing, the Juvenile Court entered an order finding a host of grounds for termination against Mother and Father.  These grounds were based largely on proof of substance abuse and domestic violence.  The Juvenile Court also found that termination of Mother and Father's parental rights is in the Child's best interest.  Mother and Father appeal.  We affirm the Juvenile Court as to certain grounds for termination found against Mother and Father.  However, we reverse certain other grounds for lack of clear and convincing evidence.  In addition, we affirm the Juvenile Court's finding that termination of Mother and Father's parental rights is in the Child's best interest.  We thus affirm, in part, and reverse, in part, the judgment of the Juvenile Court, the result being we affirm the termination of Mother and Father's parental rights to the Child.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court
Affirmed, in Part, and Reversed, in Part; Case Remanded**

D. MICHAEL SWINEY, C.J., delivered the opinion of the court, in which FRANK G. CLEMENT, JR., P.J., M.S., and ARNOLD B. GOLDIN, J., joined.

P. Michelle Greer, Powell, Tennessee, for the appellant, Joseph M.

C. Shawn Roberts, Kingston, Tennessee, for the appellant, Nicole M.

Herbert H. Slatery, III, Attorney General and Reporter, and Amber L. Seymour, Assistant Attorney General, for the appellee, the Tennessee Department of Children's Services.

# OPINION

## Background

The Child, born in May 2006, was removed into DCS custody in May 2019. At that time, the Child lived in a home with both Father and Mother. Father had sole exclusive legal custody. The Child was removed based on allegations of substance abuse and domestic violence in the home. On June 22, 2020, DCS filed a petition seeking to terminate Mother and Father's parental rights to the Child.

As are most termination of parental rights cases, this case is factually driven. This requires us to review the evidence in the record in detail. This case was tried in October 2020. DCS family service worker Leah Baird ("Baird") testified first. Baird worked on the Child's case. The Child entered DCS custody on May 22, 2019. Baird testified that the Child was placed into foster care because of substance abuse and domestic violence issues with the parents. The Juvenile Court found the Child dependent and neglected, which Mother and Father stipulated. Baird testified to efforts DCS made in the first four months following the Child's removal: "We had Child and Family Team Meetings. We had a permanency plan meeting. We offered and provided gas cards, and we referred them for in-home services for anger management, domestic violence and parenting classes. We also gave referrals for mental health assessments." Baird stated that the Child has autism and lives at a facility in a special placement. In the first four months following the Child's removal, Mother participated in in-home services but did not complete them. Mother resided at the parents' residence before going to jail. Asked whether Father completed any of his requirements to address substance abuse or domestic violence during the first four months following the Child's removal, Baird replied: "He had a mental health assessment, but did not complete the recommendations, and he was also working with in-home services, but those were not completed at that time." Father had a mental health assessment in July 2019 and then another in March 2020. Neither Mother nor Father completed an alcohol and drug assessment during the first four months following the Child's removal. During those four months, Father lived at the family residence.

A permanency plan was created for the Child. The first permanency plan was dated June 19, 2019. Under this plan, both Mother and Father were to do the following: "[C]omplete a mental health assessment and A&D assessment and follow those recommendations, to work with in-home services, parenting, domestic violence, anger management, to provide a suitable home, have stable housing, provide proof of income and transportation." Both parents also were required to submit to random drug screens. The parents were to resolve any legal issues, visit the Child, and pay child support. Baird testified that these steps were reasonably related to remedying the conditions that led to the Child being placed in foster care. The first permanency plan was ratified on July 16, 2019.

Both parents were in court on that occasion. At that time, the court advised the parents of the potential grounds for termination, including substantial noncompliance with the permanency plan. In November 2019, the permanency plan was revised. The only change was the addition of a requirement that the parents participate in the Child's treatment plan. According to Baird, this requirement was added because "[Mother and Father] had not really been participating. They had only visited Evan one time at that time." The parents participated in the development of the second plan, which was ratified in February 2020. The permanency plan was revised for a third time in April 2020. None of the action steps changed.

Baird testified to Mother's level of compliance with the permanency plans. Baird stated that Mother did not complete an alcohol and drug and mental assessment. Baird clarified, however, that Mother told her she completed an assessment while she was in jail, although she did not present Baird with any proof. Baird stated further that Mother never provided proof of sobriety to her. In addition, Mother had not provided Baird with any proof of stable housing; Mother simply told Baird a few weeks before trial that she was residing with a friend. Mother had not provided Baird with any proof of transportation or a transportation plan. On a positive note, Baird testified that Mother had a job at a fast food restaurant. Mother reported working there as of July 2020 and, to Baird's knowledge, was still working there as of the last few weeks before trial. While in jail, Mother completed some parenting and domestic violence classes. Mother maintained consistent visitation with the Child over the last few months before trial.

Turning to the subject of Father, Baird testified why he underwent a second mental health assessment: "The second one was, he had only completed the mental health and not the A&D assessment originally, so in March when he came -- he completed one through Ridgeview for a mental health and an A&D assessment together, and he had not followed the recommendations from the first one." The March 2020 assessment was thus a "combination assessment." Father was recommended to participate in the "STOP program" or some type of outpatient treatment. Baird testified she was unaware of Father having consistently participated in the STOP program. Baird also testified that Father never presented her with any proof of sobriety. However, Father completed domestic violence and parenting classes at the end of October 2019. Baird testified that Father did not consistently visit the Child earlier in the case but began to consistently visit the Child over the last few months before trial. At times during the COVID-19 pandemic, the parents were not allowed to have in-person visitation with the Child. Instead, the parents were allowed to have phone or video calls with the Child. With respect to whether Father worked, Baird testified that in June or July of 2020, Father gave her a letter reflecting he had a job. Father has a vehicle of his own, although he was arrested in June 2020 for driving on a suspended license. Baird was uncertain if Father had his license reinstated.

-3-

Continuing our review of Baird's testimony, Baird stated that Father has housing. Father gave her proof of his housing in June 2020. After receiving proof of Father's housing, Baird tried to do random visits at the house. Baird was unsuccessful in completing a random home visit until the day before trial. Baird testified that the home appeared to be appropriate in terms of its physical environment. Jennifer F., Father's girlfriend, lived with him. Baird stated she had concerns about Jennifer F., namely that "[s]he also has DCS involvement due to substance abuse issues and legal charges." Jennifer F.'s own children were in foster care. Baird stated that Jennifer F. had completed a mental health assessment and an alcohol and drug assessment, although she did not know exactly when this was done. When Baird visited Father's residence the day before trial, both Father and Jennifer F. submitted to drug screens. Father and Jennifer F. failed for Suboxone; however, they had prescriptions for the drug. Baird testified that Mother, Father, and Jennifer F. all had pending criminal issues. Baird stated that Father's last visit with the Child before the petition was filed was on Christmas of 2019. The visit occurred at Father's sister's house. According to Baird, between Christmas of 2019 and June 22, 2020, Father did not visit the Child. Baird stated: "They had planned one at the end of May and the facility had asked or put it on hold due to COVID, and also Evan had tested positive." Baird testified that, to her knowledge, Father did not participate in any video visitation during that time period but did call on the phone "randomly."

Baird testified that Mother was incarcerated from November 13, 2019 through April 22, 2020. Mother also was incarcerated for one day at the end of June 2019 and then from July 16, 2019 through November 6, 2019. Baird stated that, before the petition was filed, Mother visited the Child once in July of 2019. Mother did not pay regular child support at that time. Baird testified that, in her view, Mother had engaged in conduct exhibiting a wanton disregard for the Child's welfare in the form of "[t]he substance abuse and the domestic violence." Baird stated that Mother and Father had the same issues on June 22, 2020, the date the petition was filed, that they had when the Child was first placed into state custody. Baird stated: "The substance abuse had not been addressed, and at that time I wasn't aware of mom completing any of the steps either." Baird testified that Father was arrested for domestic violence in November 2019 despite having completed domestic violence classes in October 2019.

Baird stated that Mother and Father consistently visited the Child in the last few months before trial. According to Baird, Mother and Father sometimes visited together and sometimes visited separately. Baird stated she was unsure if the parents participated in the Child's treatment program. Baird testified to the Child's special needs: "Besides being autistic, he also has hearing aids. He needs the stability and structure. He has an IEP for his learning disability, to have his regular mental and dental and medication management." Baird stated that routine is very important for the Child. Baird testified that the Child had some behavioral issues following visits with Mother and Father. Namely,

-4-

the Child "[t]ried to like run out from the home, was trying to run from the facility, and a little more aggressive." Baird stated that Mother and Father had not shown they could address the Child's specific needs. Baird testified that if the state had full guardianship of the Child, it would "seek a home that specializes in his specific needs, so we would look for a home that is familiar with his needs and is able to provide for those needs." Baird stated that certain foster homes could only be explored if the Child were under full state guardianship.

On cross-examination, Baird was asked to list the things Mother accomplished while she was incarcerated. Baird stated: "She did a parenting class, she did something called Hannah's Gift, she did parenting and family values, and then also did some type of finance class, and she said she had completed a mental health assessment, but I don't have any copies of proof of that." Asked if she had inquired about the missing certificate of completion, Baird stated: "Yes. I had asked our fiscal person if we had any copies, and I asked the jail director if she had any proof as well." Baird stated that jail personnel told her they did not keep copies and would have just given the document to Mother. After she was released from jail, Mother maintained regular contact with Baird. Asked if she was able to do a home visit or inspection for Mother, Baird stated: "There was one that she reported in Clinton and then she was no longer there, she was back in Knoxville living with a friend, and I did not get that address, she did not give that." Baird testified that Mother made regular child support payments after she was released from jail. Mother visited the Child once per month. Mother missed a visit in May, but that was due to COVID. Baird stated that Mother's visits with the Child were appropriate. Baird testified further that Mother and the Child were bonded. Asked if terminating his parents' parental rights would have an impact on the Child, Baird stated: "A little, yes, but he also doesn't have frequent contact." Baird was then asked to elaborate on that assessment. Baird testified: "He's not had frequent contact or visitation, he doesn't ask for them, other than during the visits or during phone calls." Baird stated that, in her view, it is in the Child's best interest for Mother and Father's parental rights to be terminated. Baird explained: "The domestic violence, the substance abuse, those things haven't been addressed; the legal issues, some of those are not resolved still at this time and still pending."

On the matter of Father's drug use, Baird testified that Father had "only provided just where he is going for his Suboxone and goes for like some type of counseling whenever he goes for his refill prescription." Father told Baird that he was participating in an "[intensive outpatient program]" but had not shown her any proof. Asked if Father was receiving medication management and Suboxone with a valid prescription, Baird testified: "He provided proof of the one, I want to say the end of June there, but I did not see the prescription yesterday." Baird stated that she asked Father to show her his prescription but he did not produce any, although "he may not have heard me." Baird was then asked about a drug test Father was supposed to submit to. Father did not have sufficiently long nails to

undergo a nail test. Father was confused as to whether a hair follicle test would be acceptable instead. Baird stated:

> Q. Did he know that he could go back and submit to a hair follicle screen?
> A. I'm not for sure what the texts -- what we had corresponded back and forth, the exact wording.
> Q. But you don't recall ever explicitly notifying him and saying explicitly the hair follicle screen is approved, you may go back to NetGain now and submit to a hair follicle?
> A. Like I said, I'm not for sure of the wording.
> Q. Then he did submit to a urine drug screen yesterday?
> A. Yes.
> Q. Was it negative for all substances except for what he is prescribed?
> A. Correct.
> Q. So it does seem as though he may have remedied the substance abuse issues?
> A. That he has a current prescription for that, yes.
> Q. But based on the negative drug screen and his willingness and eagerness to submit to a hair follicle screen, does it sound perhaps he has remedied his substance abuse issue?
> A. Well, I'm not for sure about the substance abuse treatment, though.

Continuing her testimony, Baird stated that Father had been indicted for aggravated assault and domestic assault. Father's most recent criminal charge was driving on a suspended license in June. Baird testified that Jennifer F. sent her a photocopy of Father's license to show it was current and valid. Baird stated she was a family service worker on Jennifer F.'s own child welfare case. Asked to expand on Father's record of visitation, Baird testified:

> Q. Ms. Baird, you stated that recently [Father] has been more consistent in visiting Evan. When is the last time he visited him?
> A. The end of September.
> Q. So just recently?
> A. Yes.
> Q. And did he go in person?
> A. Yes.
> Q. How far away is that?
> A. It's roughly three hours.
> Q. Approximately three and a half hours to Columbia; correct?
> A. Yes, and the placement had offered previously about coming out to meet them.

Q. Which is still a good distance away?
A. Yes.
Q. And previously the Department did offer him gas cards to go see Evan?
A. Yes.
Q. At that time [Father] did not have a valid driver's license; is that correct?
A. I'm not for sure.
Q. One of his tasks was to obtain a valid driver's license. So he didn't have a valid driver's license in order to utilize a gas card, unless he imposed upon somebody else to take him to Columbia with that gas card; is that correct?
A. And he had stated that he had other persons that could help him. I know his sister had taken him before.

Baird stated that she was unaware of any concerns regarding domestic violence between Father and Jennifer F. Baird testified that, in the last few months before trial, Father visited the Child regularly and paid child support. Asked why she believed termination of Father's parental rights would be in the Child's best interest, Baird stated: "Evan would need that consistency and structure. He doesn't need to be involved or around any of the substance abuse or domestic violence." Baird stated that even if those two issues were addressed as to Father, she would still be concerned about Jennifer F. residing in the home because of her own history of legal issues. Regarding the Child's placement, Baird stated he lived at a facility with a school and dorm. There, the Child is kept on a routine. Baird testified that the Child is well-adjusted in his placement.

Mother testified next. Mother stated that the Child was first removed from her in 2009 because of her substance abuse issues. At the time, Father was serving a three year prison sentence. Mother testified that the Child was born exposed to drugs. Mother and Father regained custody of the Child in 2010. In 2011, DCS became involved with the family again as Mother's substance abuse issue re-emerged. The Child was placed in Father's custody while Mother undertook steps to regain custody as well. In 2012, Mother regained her custody of the Child. Mother testified: "I would always do everything I was required to do, but I could not maintain sobriety long enough." Later in 2012, DCS became involved with the family yet again based on Mother's substance abuse; the Child returned to Father's custody. Mother went to an inpatient facility and then to a halfway house. In 2013, all restrictions were lifted on Mother's contact with the Child. DCS did not get involved with the family again until 2019 and the commencement of this current case.

Mother testified that, in the spring of 2019, she was once more having substance abuse issues. Mother stated: "I would get highly medicated and pass out at home while Evan was there, and he would go outside and play, and he broke an ashtray at the neighbor's, and I believe he was acting out, because he was tired of his mom being passed out in the bed and not taking care of him." Mother stated she was using drugs with Father

during that time. Mother used prescription pills and methamphetamine. Regarding incidents of domestic violence, Mother testified: "The methamphetamines is what causes us to be physical…." Mother stated she had domestic violence issues with Father when they first got together in 2002 and 2003 and were both using methamphetamine. In 2004, Mother married Father and became pregnant with the Child. Mother and Father quit methamphetamines for around ten years. Mother testified there were no domestic violence incidents during that decade stretch. Mother stated that she and Father also took Suboxone, Opanas, and Oxymorphone. When DCS became involved with the family in 2019, Mother lied and told DCS she was clean. Mother also lied about Father's drug use. Mother stated: "I told her that he was in a Suboxone clinic, which he was not, so I was dishonest." Mother stated further that she helped Father alter his urine screen. Mother testified that she went to jail one day in June 2019 for shoplifting. By incurring this charge, Mother violated her probation. Mother testified that, while serving her sentence, she was mistakenly released for a week.

In November 2019, Mother was subjected to domestic violence during her time out of jail. Father had broken up with Mother while she was incarcerated. Father told Mother she was not to come back to his home. Mother went anyway. Jennifer F. was at the residence. Jennifer F. had been Mother's best friend since seventh grade. Mother stated that she and Jennifer F. used drugs together in the past. Mother testified that Jennifer F.'s children had been removed from her due to Jennifer F.'s own substance abuse issues. Jennifer F. incurred "meth charges" in August 2019. During her time out of jail, Mother continued to see Father and Jennifer F. Mother testified to an incident of domestic assault:

> Well, I had picked [Father] up from work that day in his vehicle because Jennifer was asleep, and we were fighting on the way home, hitting each other, punching each other, and then later on that night at the house … [Father] had busted my mouth again, and I don't know if the bleeding was from the one earlier driving him home from work or from that night, and someone called the police. It definitely wasn't me; I didn't have a phone. It definitely wasn't [Father]. And it was my idea to hide in the bathroom, and I told Jennifer and Joe to tell the police I wasn't there, and I could hear the police talking to Joe and Jennifer.

After the police left, Mother left as well. However, she met Father again the next day. While out with Father and Jennifer F., a police officer noticed Mother's busted lip and asked her about it. Mother told the police officer that Father had assaulted her. Father was charged later with aggravated assault. Mother then testified to another episode of domestic violence. Mother and Father were in a vehicle arguing over a letter. Jennifer F. got involved and Mother began to hit her. Mother stated:

-8-

[Father] threw the vehicle in park and said I wasn't going to put my hands on his old lady, and he got out and whaled on me and threw me out of the vehicle, and I hurried and jumped back in, because my purse and all my belongings was in the vehicle, and he drove about a couple car lengths ahead, threw the car in park again. This time he threw all my bags, my hamper, everything in the street, and then he threw me out after beating on me.

Mother stated that she went to the hospital with bruises all over her body. Mother testified she lost two toenails upon her return to jail because Father stomped on her foot during the altercation.

In April 2020, upon Mother's release from jail, she moved into a halfway house of sorts. Mother stayed there for three or four weeks. Mother then stayed with a friend for about a month. After that, Mother moved into a motel for a couple of weeks. Mother then moved into an apartment with a woman she worked with at the fast food restaurant. Around three weeks before trial, Mother took over the apartment lease and her co-worker moved out. Mother was hired at the fast food restaurant the day after she was released from jail in April 2020. Mother then contacted child support services so they could begin deducting child support out of her paycheck. In September, Mother made a lump payment of $1,115 in child support with help from federal stimulus money. Mother stated she completed an alcohol and drug assessment, although she did not have a copy of her assessment. Mother was prescribed Celexa for anxiety and depression. As of trial, Mother was not undergoing any sort of individual therapy. After she got out of jail, Mother attended NA meetings. Mother stated she had completed approximately five IOPs in the past. Mother testified she felt she needed another IOP as she continued to have drug relapses. Mother stated that she last used drugs three weeks before trial at which time she used marijuana, methamphetamine, and Suboxone. Mother stated that she kept in touch with Father only on issues related to the Child. Mother stated she has since had a "woman-to-woman conversation" with Jennifer F. Asked about the time she helped Father alter his drug screen the previous year, Mother stated that "when you're using and you're addicts, you don't make the best decisions, and sometimes you don't practice honest behavior." Mother testified that she lives in a studio apartment that has room for the Child. Mother stated:

I am working on getting help, with me making eight dollars an hour, family assistance, and I am having trouble with going through all the resources and I need help with reaching out, because I don't know much about the Knoxville resources, but I have been going online and trying to find out as much as I can, and I did find out that I can apply for the family two-bedroom with the issue going on, how Evan is not in my custody right now, but I'm trying to get him back, so that would put me on the family list.

Mother testified that she relies on public transportation. Asked how she could avoid another relapse, Mother stated: "[I]f I have therapy and if I have drug screens weekly to hold me accountable, that would prevent me from relapsing. I just need accountability for a little while." Regarding visits, Mother stated that when she first got out of jail, she called the Child every day until she was told by the facility that was excessive. Mother's practice became one video call per week and three phone calls per week. Mother also wrote letters to the Child. As to in-person visitation, Mother stated she only did these once per month given the distance to the Child's facility. Mother stated that she missed a September visit because the person who was supposed to take her was involved in a car wreck. Mother stated she was continually trying to get an alcohol and drug assessment done and had left voice messages with Helen Ross McNabb in a bid to continue treatment for her substance abuse. Regarding her view of Father, Mother testified he is an excellent parent. Mother stated further that Father and the Child have a strong bond. Mother testified that Father never acted violently toward the Child.

Next and the last to testify was Father. Asked why he had allowed his drug screen to be altered at the time of the Child's removal, Father stated this was "[t]o keep my kid out of State's custody or being jerked from home." Father then was using methamphetamine and Suboxone. Father also periodically used oxycodone. Father began using Suboxone in 2014 or 2015. Suboxone is sometimes used to treat opiate addiction. Father stated: "I've been using Suboxone for a while. I was in a clinic and then got kicked out, so I started buying it off the street and just would dabble with methamphetamine." Father testified to the actions he took soon after the Child was removed from his custody:

Got into a Suboxone clinic, went and got the evaluation I guess for mental health, but I was having problems working and making appointments on time, so they wouldn't see me for the mental health, and just was taking stuff -- getting stuff at home with anger management and Omni. That's basically it.

Father stated that he was arrested for domestic assault against Mother in June 2019. In November 2019, Father was charged again with domestic assault against Mother. Father stated he agreed with Mother that they only had domestic violence issues when they were using methamphetamines. Asked when he stopped using methamphetamines, Father stated: "When did I stop? I guess in November, because I don't do it that much. I just do it every now and again." Father testified that he was in an IOP program and attended every two weeks. Father stated he has a prescription for Suboxone. Father then testified to his home, which was a rental. Father had lived there for six months. The home contains two bedrooms and two full baths. Jennifer F. lives there with Father. Father stated that Jennifer F.'s two children could potentially live in the home as well. Father, a plumber, worked "Monday through Friday, 7:00 a.m., 7:30 a.m. to whenever, dark, whatever." Asked how

-10-

he could ensure he and Jennifer F. would not relapse on drugs, Father stated: "Going to meetings and just going to meetings and stay positive." Father stated he had never completed any alcohol or drug treatment in the past. Father stated he had never done any individual therapy or IOPs in the past. Father was unaware of Jennifer F. participating in any alcohol and drug treatment at the time of trial. For insurance, Father relied on TennCare. Father stated he had his driver's license reinstated. Asked if he could provide for the Child if the Child returned to him that day, Father stated: "Yes. It would be hard. I would have to ask -- you know, rely on my family." Father stated he had a number of family members who could help him. Father agreed that routine and stability were important to the Child. Asked why things would be different this time if the Child were returned to him, Father stated: "I'm not with his mother is what's different." Pressed if that meant Mother was to blame for his issues, Father stated it was "[b]oth our faults." Asked if Jennifer F. was a better choice of companion than Mother, Father stated she was "[a]t the moment."

Father then testified about the incident with Baird wherein he was confused about whether he was supposed to take a hair follicle drug test or a nail drug test, as well as where he stood at present with his substance abuse:

Q. Prior to arriving at NetGain, you did not know that you needed to have nails to be able to submit to a nailbed screen?
A. No, I didn't.
Q. And when you notified her that you do not have fingernails and you have a hard time growing your fingernails, she said that she would see about getting a hair follicle approved?
A. Yes.
Q. And then did she ever after that follow-up to tell you that the hair follicle screen had indeed been approved?
A. No, ma'am.
Q. But she did on October the 5th say that you can go to NetGain; correct and --
A. Yes. That was just a text message I got out of nowhere, but honestly I think she meant to send it to Nicole, because that's when Nicole was trying to go take hers.
Q. So that text message did not say, [Father], the hair follicle has been approved, you may go submit to a hair follicle screen?
A. No. It just says NetGain. Yeah.
Q. Then you responded, you didn't just ignore that message, you responded; is that correct?
A. Yeah, I responded, because it was -- yeah, October 5th.
Q. What did you respond with? What did you say?

A. I said I've been down there, I can't grow my fingernails long enough.
Q. Then on the next day she responded, on October 6th, so last week she says that she will ask about a hair follicle; correct?
A. Yes, ma'am.
Q. Did that lead you to think that a hair follicle had not yet been approved?
A. Yes, ma'am.
Q. Are you perfectly willing to submit to a hair follicle drug screen?
A. Yes, ma'am.
Q. If you submitted to a hair follicle drug screen, what would it show? What do you believe it will show?
A. That I pass it. It would show --
Q. What would you test positive for, do you think?
A. Buprenorphine, Suboxone.
Q. For which you have a valid prescription?
A. Yes, ma'am.
Q. So would you say that you have remedied your substance abuse issues and that you are continuing to work on staying clean?
A. Yes, ma'am, I'm trying. Yeah, I'm working on it every day. It's hard, but, yeah, I'm working on it.
Q. You stated I believe to Ms. Rucker that the last time you used methamphetamine was approximately November; is that correct?
A. Yes, ma'am.
Q. I believe in your A&D assessment which you took in March, you stated that you had used a couple of months prior to that assessment. Would that be possible?
A. In March?
Q. So it may have been earlier this year when you last used methamphetamine?
A. Could have been, yeah.
Q. But it was indeed quite some time ago, several months ago?
A. Yes, ma'am.
Q. So you don't believe that it would show up on a hair follicle at this point?
A. No.

Father testified that he had pending criminal charges for domestic assault. Father stated that he nevertheless had housing, income, and transportation, and had provided proof of all three to DCS. Father stated he had completed a mental health assessment as well as an alcohol and drug assessment and was following the recommendations. Father stated he completed parenting classes and domestic violence classes. Father testified that he felt he had sufficiently remedied the domestic violence and substance abuse concerns DCS had.

-12-

Asked if he would comply with any restriction the court might place on Jennifer F.'s contact with the Child, Father testified he would.

Regarding visits with the Child, Father stated he talked to him on the phone "two or three times a month." Father stated he also had face to face visits. Father stated that for the time period of December 2019 through June 2020, "I seen him at Christmas, and then the COVID stuff, I didn't get to see him." Asked if he called the Child two or three times a month during that period as he came to do later on, Father stated no. Father testified he made no video calls to the Child during that early COVID period.

In November 2020, the Juvenile Court entered its final judgment terminating Mother and Father's parental rights. The Juvenile Court found the following grounds were proven against Mother by clear and convincing evidence: (1) abandonment by incarcerated parent for failure to visit; (2) abandonment by incarcerated parent for failure to support; (3) abandonment by wanton disregard; (4) abandonment by failure to provide a suitable home; (5) substantial noncompliance with the permanency plans; (6) persistent conditions; and (7) failure to manifest an ability and willingness to assume custody. Regarding Father, the Juvenile Court found the following grounds by clear and convincing evidence: (1) abandonment by failure to visit; (2) abandonment by failure to provide a suitable home; (3) substantial noncompliance with the permanency plans; (4) persistent conditions; and (5) failure to manifest an ability and willingness to assume custody. The Juvenile Court found, also by clear and convincing evidence, that termination of Mother and Father's parental rights is in the Child's best interest. In its detailed parental rights termination order, the Juvenile Court after making extensive findings of fact further found, in relevant part:

### I. ABANDONMENT — FAILURE TO VISIT
### T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(i), -102 (i)(C) and - 102(1)(E)
### As to [Father]

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(1) and 36-1-102(1)(A)(i), -102 (1)(C) and -102(1)(E), the Court finds that there is clear and convincing evidence that [Father] abandoned the child by failing to visit him. The *Petition to Terminate Parental Rights* was filed on June 22, 2020. In the four months prior to the filing, from February 21, 2020 until June 21, 2020, the father did not have any visits with Evan at all. His last visit prior the filing of the petition was on December 25, 2019, when he visited with Evan at the paternal aunt's house during a Christmas visit. The father was not incarcerated in the four or otherwise incapacitated in the four months before the petition was filed. [Father] was aware of the consequences of failing to visit Evan regularly, because the Juvenile Court explained that to

him on July 16, 2019. He also signed the Department's *Criteria and Procedures for Termination of Parental Rights*, which includes an explanation of those consequences, on July 16, 2019.

## 2. ABANDONMENT — FAILURE TO PROVIDE SUITABLE HOME
## T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(ii)
## As to Both Respondents

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(1) and 36-1-102(1)(A)(ii), the Court finds that there is clear and convincing evidence that [Father] and [Mother] abandoned the child by failing to provide a suitable home to which he could return. Evan was removed from the father's legal custody and from the home where he was residing with the mother and father on May 22, 2019. The Juvenile Court's protective custody order found that reasonable efforts were made to prevent the removal of the child from the home.

In the four months after the removal, from May 23, 2019 until September 23, 2019, DCS made reasonable efforts to help the parents provide a suitable home for Evan by developing a permanency plan; conducting child and family team meetings; provided in-home services to help the parents complete anger management, domestic violence, and parenting classes; referred the parents for mental health and alcohol and drug assessments; provided them with visitation with Evan; provided them with gas cards for transportation to visit Evan; and provided them with ongoing advice and recommendations.

In those same four months after the removal, the parents made little efforts to provide a suitable home. [Father] completed a mental health assessment in July 2019, but he declined an appointment in August 2019 to complete his alcohol and drug assessment. Both parents were working with in-home services but failed to complete those services in the first four months. Both parents obtained new criminal charges. The parents' failure to make even minimal efforts to improve their home and/or personal condition demonstrates a lack of concern to such a degree that it appears unlikely that they will be able to provide a suitable home at an early date.

## 3. ABANDONMENT BY INCARCERATED PARENT
## T.C.A. §§ 36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102 (1)(B), -102 (1)(C)
## -102 (1)(D) and -102(1)(E)
## As to [Mother]

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(1) and 36-1-102(1)(A)(iv), -102 (1)(B), -102 (1)(C), -102 (1)(D) and -102(1)(E), the Court finds that there is clear and convincing evidence that [Mother] abandoned the child as defined by law. The *Petition to Terminate Parental Rights* was filed on June 22, 2020. The mother, [Mother], was incarcerated in the four months prior to that filing. [Mother] was in jail from November 13, 2019 until April 22, 2020 for charges of failure to appear and violation of probation and she was serving time for a previous charge. Prior to that she was in jail from July 17, 2019 until November 6, 2019 for failure to appear. Prior to that, she was in jail from June 29, 2019 until June 30, 2019 for violation of probation.

There was no four month period prior to the filing of the petition when the mother was not incarcerated. However, during the periods of time when she was not incarcerated, the mother failed to visit the child regularly and to pay child support regularly. The mother had one visit with Evan in July 2019 and paid one payment of $69.23 in child support on June 8, 2020. The Court finds that this was token visitation and token support. The mother was aware of the consequences of her failure to visit the child regularly and to pay child support because she signed the Department's *Criteria and Procedures for Termination of Parental Rights*, which includes an explanation of those consequences, on June 19, 2019. The Juvenile Court also explained the consequences to her on July 16, 2019. [Mother] has engaged in conduct that exhibits a wanton disregard for the welfare of the child by engaging in criminal conduct, violating probation, using illegal drugs, and failing to maintain visitation with the child.

## 4. SUBSTANTIAL NONCOMPLIANCE WITH PERMANENCY PLAN
### T.C.A. §§ 36-1-113(g)(2) and 37-2-403(a)(2)
### As to Both Respondents

In this case, pursuant to Tenn. Code Ann. §§36-1-113(g)(2) and 37-2-403(a)(2), the Court finds that there is clear and convincing evidence that [Father] and [Mother] failed to substantially comply with permanency plans ratified and made orders of this Court. After Evan was placed in DCS custody, DCS developed permanency plans for him. The first plan was developed on June 19, 2019 and listed numerous requirements that the parents needed to complete before Evan could safely be returned home. The first plan required the parents to complete mental health and alcohol and drug assessments and comply with all resulting recommendations; to submit to and pass random drug screens; complete domestic violence and parenting

classes; maintain contact with DCS; resolve all legal issues; sign releases of information for DCS; obtain and maintain stable housing and income; visit Evan, and pay child support. The first plan was ratified by the Court on July 16, 2019 as in the child's best interest and the Court found on that date that the action steps were reasonably related to remedying the reasons that Evan was in foster care. Both the parents were present in Court on that date.

The plan was revised on November 8, 2019. The action steps for the parents to complete did not change, but a requirement was added for the parents to participate in Evan's treatment plan. The second plan was ratified by the Court on February 11, 2020 as in the child's best interest and the Court found that the action steps were reasonably related to remedying the reasons that Evan was in foster care.

The plan was revised again on April 24, 2020, but the action steps for the parents did not change. The third plan was ratified by the Court on July 30, 2020 as in the child's best interest and the Court found that the action steps were reasonably related to remedying the reasons that Evan was in foster care. The Court again finds that the action steps for the parents to complete on all three plans reasonably related to remedying the reasons that Evan was in foster care.

The parents completed some tasks on the plan but did not substantially comply with the requirements of the permanency plan. Both parents completed parenting classes and domestic violence classes. [Father] completed his first mental health assessment in July 2019 but failed to comply with the recommendations of that assessment. He had another mental health assessment and an alcohol and drug assessment in March 2020 but has not yet completed the requirements of those assessments, specifically completion of the STOP program through Ridgeview. [Father] obtained housing around the time that the *Petition to Terminate Parental Rights* was filed, although he resides with his paramour, Jennifer [F.]. Both Ms. [F.] and [Father] have pending criminal drug charges. [Father] has had five new arrests since Evan was placed into DCS custody, three of which were for assault. [Father] was indicted by the Anderson County Grand Jury on September 1, 2020 for aggravated assault with strangulation and domestic Assault. Ms. [F.] was also Anderson County Grand Jury [sic] on September 1, 2020 for multiple drug charges, theft, and trespass.

The mother completed reported that as of the date of trial she had a studio apartment which she leased at the end of September 2020, and she worked at [a fast food restaurant] making $8.00 per hour. She reported that she plans to use public transportation for herself and Evan if he were to be returned to her custody. [Mother] admitted that she last used illegal drugs, specifically THC, methamphetamine, and suboxone, about three weeks prior

-16-

to trial. She admitted that [Father] has assaulted her twice after Evan was removed, these domestic violence incidences having occurred in November 2019. [Mother] reported that she completed an alcohol and drug assessment and a mental health assessment while she was in jail but has provided no proof of that.

## 5. PERSISTENT CONDITIONS
### T.C.A. § 36-1-113(g)(3)
### As to Both Respondents

In this case, pursuant to Tenn. Code Ann. §36-1-113(g)(3), the Court finds that there is clear and convincing evidence that the conditions which led to the removal of the child persist to this date. It has been seventeen months since Evan was placed in DCS custody. DCS removed the child from the parents' home and the father's custody because of the parents' substance abuse and domestic violence issues. The conditions which led to the removal persist in that the parents have continued to engage in domestic violence. The mother admitted that [Father] has assaulted her twice after Evan was removed, these domestic violence incidences having occurred in November 2019. [Father] has pending assault charges due to this. The mother admitted on the date of trial that she last used illegal drugs, specifically THC, methamphetamine, and suboxone, about three weeks prior to trial. The father reported that he did not complete an alcohol and drug assessment until March 2020 and as of the date of trial, he had not completed the recommended intensive outpatient program. The father testified that he had a prior opiate addiction for five to ten years. He testified that after Evan's removal, he got into a suboxone clinic but only lasted in that program for two months. In November 2019, he admitted that he was using suboxone without a prescription and methamphetamine. He admitted that his paramour, Jennifer [F.], also has a substance abuse history and that her children have been removed from her custody as a result. He also admitted that he was not aware if she had completed any substance abuse treatment.

## 6. FAILURE TO MANIFEST AN ABILITY AND WILLINGNESS TO ASSUME CUSTODY
### T.C.A. § 36-1-113(g)(14)
### As to Both Respondents

In this case, pursuant to Tenn. Code Ann. §36-1-113(g)(14), the Court finds that there is clear and convincing evidence that both parents have failed to manifest, by act or omission, an ability and willingness to assume legal

and physical custody of the child. The parents have a long history of substance abuse, which has not been fully addressed or resolved. The parents have a history of domestic violence issues and the father still has pending assault charges. Placing the child in either of the parent's custody would pose a risk of substantial harm to the psychological and physical welfare of the child. Evan is autistic and requires a higher level of care than most children. He needs stability and a reliable, sober caretaker. The parents have failed to demonstrate that they can provide stability and sobriety to meet the child's needs.

## BEST INTEREST
## T.C.A. § 36-1-113(i)

Under Tenn. Code Ann. §36-1-113(i)(1), the Court is required to find that termination of parental rights is in the child's best interest.

In this case, the Court finds that there is clear and convincing evidence that termination of the parental rights of [Mother] and [Father] is in the best interest of the child as follows:

1. [Mother] and [Father] have not made changes in their conduct or circumstances that would make it safe for the child to go home. The mother has not completed alcohol and drug treatment and admitted to recent drug use. The father has not completed his recommended alcohol and drug treatment. They have continued to engage in criminal conduct and domestic violence after Evan was removed.

2. [Mother] and [Father] have not made lasting changes in their lifestyle or conduct after reasonable efforts by the state to help, so that lasting change does not appear possible. Despite help from the state for seventeen months, they have engaged in an ongoing cycle of substance abuse, domestic violence, and incarcerations.

3. [Mother] and [Father] have not maintained regular visitation with the child.

4. Changing caregivers at this stage of his life will have a detrimental effect on him. He is autistic and has specialized needs and stability. He is receiving the care he needs now, but the Court finds that this would likely deteriorate quickly if returned to the parents' care.

5. [Mother] and [Father] have abused or neglected the child by exposing him to domestic violence and substance abuse.

6. There is crime in Respondents' homes.

7. [Mother] and [Father] abuse drugs or alcohol, rendering them consistently unable to care for the child in a safe and stable manner.

8. The parents' mental or emotional state would be detrimental to the child and/or would prevent them from effectively parenting the child.

9. [Mother] has not paid child support consistently.

10. [Mother] and [Father] continue to make lifestyle choices which prevent them from being able to safely parent the child.

**IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED:**

That all of the parental rights of [Mother] and [Father] to the child, Evan [M.], be and the same are hereby forever terminated….

Mother and Father timely appealed to this Court.[1]

### Discussion

Although not stated exactly as such, Father raises the following issues on appeal: 1) whether the Juvenile Court erred in finding the ground of failure to visit; 2) whether the Juvenile Court erred in finding the ground of failure to provide a suitable home; 3) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; 4) whether the Juvenile Court erred in finding the ground of persistent conditions; 5) whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody; and, 6) whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. For her part, Mother raises the following issues on appeal, which we restate as follows: 1) whether the Juvenile Court erred in finding the ground of failure to provide a suitable home; 2) whether the Juvenile Court erred in finding the ground of failure to visit; 3) whether the Juvenile Court erred in finding the ground of failure to support; 4) whether the Juvenile Court erred in finding the ground of wanton disregard; 5) whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan; and, 6) whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest.

As our Supreme Court has instructed regarding the standard of review in parental rights termination cases:

---

[1] By order of this Court, Mother and Father's appeals were consolidated.

A parent's right to the care and custody of her child is among the oldest of the judicially recognized fundamental liberty interests protected by the Due Process Clauses of the federal and state constitutions.[2] *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *In re Angela E.*, 303 S.W.3d 240, 250 (Tenn. 2010); *In re Adoption of Female Child*, 896 S.W.2d 546, 547-48 (Tenn. 1995); *Hawk v. Hawk*, 855 S.W.2d 573, 578-79 (Tenn. 1993). But parental rights, although fundamental and constitutionally protected, are not absolute. *In re Angela E.*, 303 S.W.3d at 250. "'[T]he [S]tate as *parens patriae* has a special duty to protect minors . . . .' Tennessee law, thus, upholds the [S]tate's authority as *parens patriae* when interference with parenting is necessary to prevent serious harm to a child." *Hawk*, 855 S.W.2d at 580 (quoting *In re Hamilton*, 657 S.W.2d 425, 429 (Tenn. Ct. App. 1983)); *see also Santosky v. Kramer*, 455 U.S. 745, 747, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982); *In re Angela E.*, 303 S.W.3d at 250. "When the State initiates a parental rights termination proceeding, it seeks not merely to infringe that fundamental liberty interest, but to end it." *Santosky*, 455 U.S. at 759, 102 S.Ct. 1388. "Few consequences of judicial action are so grave as the severance of natural family ties." *Id.* at 787, 102 S.Ct. 1388; *see also M.L.B. v. S.L.J.*, 519 U.S. 102, 119, 117 S.Ct. 555, 136 L.Ed.2d 473 (1996). The parental rights at stake are "far more precious than any property right." *Santosky*, 455 U.S. at 758-59, 102 S.Ct. 1388. Termination of parental rights has the legal effect of reducing the parent to the role of a complete stranger and of "severing forever all legal rights and obligations of the parent or guardian of the child." Tenn. Code Ann. § 36-1-113(*l*)(1); *see also Santosky*, 455 U.S. at 759, 102 S.Ct. 1388 (recognizing that a decision terminating parental rights is "*final* and irrevocable"). In light of the interests and consequences at stake, parents are constitutionally entitled to "fundamentally fair procedures" in termination proceedings. *Santosky*, 455 U.S. at 754, 102 S.Ct. 1388; *see also Lassiter v. Dep't of Soc. Servs. of Durham Cnty., N.C.*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981) (discussing the due process right of parents to fundamentally fair procedures).

Among the constitutionally mandated "fundamentally fair procedures" is a heightened standard of proof – clear and convincing

---

[2] U.S. Const. amend. XIV § 1 ("[N]or shall any State deprive any person of life, liberty, or property, without due process of law . . . ."). Similarly, article 1, section 8 of the Tennessee Constitution states "[t]hat no man shall be taken or imprisoned, or disseized of his freehold, liberties or privileges, or outlawed, or exiled, or in any manner destroyed or deprived of his life, liberty or property, but by the judgment of his peers or the law of the land."

evidence. *Santosky*, 455 U.S. at 769, 102 S.Ct. 1388. This standard minimizes the risk of unnecessary or erroneous governmental interference with fundamental parental rights. *Id.*; *In re Bernard T.*, 319 S.W.3d 586, 596 (Tenn. 2010). "Clear and convincing evidence enables the fact-finder to form a firm belief or conviction regarding the truth of the facts, and eliminates any serious or substantial doubt about the correctness of these factual findings." *In re Bernard T.*, 319 S.W.3d at 596 (citations omitted). The clear-and-convincing-evidence standard ensures that the facts are established as highly probable, rather than as simply more probable than not. *In re Audrey S.*, 182 S.W.3d 838, 861 (Tenn. Ct. App. 2005); *In re M.A.R.*, 183 S.W.3d 652, 660 (Tenn. Ct. App. 2005).

Tennessee statutes governing parental termination proceedings incorporate this constitutionally mandated standard of proof. Tennessee Code Annotated section 36-1-113(c) provides:

> Termination of parental or guardianship rights must be based upon:
>
> (1) A finding by the court by clear and convincing evidence that the grounds for termination of parental or guardianship rights have been established; and
> (2) That termination of the parent's or guardian's rights is in the best interests of the child.

This statute requires the State to establish by clear and convincing proof that at least one of the enumerated statutory grounds[3] for termination exists and that termination is in the child's best interests. *In re Angela E.*, 303 S.W.3d at 250; *In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006); *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002). "The best interests analysis is separate from and subsequent to the determination that there is clear and convincing evidence of grounds for termination." *In re Angela E.*, 303 S.W.3d at 254. Although several factors relevant to the best interests analysis are statutorily enumerated,[4] the list is illustrative, not exclusive. The parties are free to offer proof of other relevant factors. *In re Audrey S.*, 182 S.W.3d at 878. The trial court must then determine whether the combined weight of the facts "amount[s] to clear and convincing evidence that termination is in the child's best interest." *In re Kaliyah S.*, 455 S.W.3d 533, 555 (Tenn. 2015). These

---

[3] Tenn. Code Ann. § 36-1-113(g)(1)-(13).
[4] Tenn. Code Ann. § 36-1-113(i).

requirements ensure that each parent receives the constitutionally required "individualized determination that a parent is either unfit or will cause substantial harm to his or her child before the fundamental right to the care and custody of the child can be taken away." *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999).

Furthermore, other statutes impose certain requirements upon trial courts hearing termination petitions. A trial court must "ensure that the hearing on the petition takes place within six (6) months of the date that the petition is filed, unless the court determines an extension is in the best interests of the child." Tenn. Code Ann. § 36-1-113(k). A trial court must "enter an order that makes specific findings of fact and conclusions of law within thirty (30) days of the conclusion of the hearing." *Id*. This portion of the statute requires a trial court to make "findings of fact and conclusions of law as to whether clear and convincing evidence establishes the existence of each of the grounds asserted for terminating [parental] rights." *In re Angela E.*, 303 S.W.3d at 255. "Should the trial court conclude that clear and convincing evidence of ground(s) for termination does exist, then the trial court must also make a written finding whether clear and convincing evidence establishes that termination of [parental] rights is in the [child's] best interests." *Id*. If the trial court's best interests analysis "is based on additional factual findings besides the ones made in conjunction with the grounds for termination, the trial court must also include these findings in the written order." *Id*. Appellate courts "may not conduct de novo review of the termination decision in the absence of such findings." *Id*. (citing *Adoption Place, Inc. v. Doe*, 273 S.W.3d 142, 151 & n. 15 (Tenn. Ct. App. 2007)).

### B. Standards of Appellate Review

An appellate court reviews a trial court's findings of fact in termination proceedings using the standard of review in Tenn. R. App. P. 13(d). *In re Bernard T.*, 319 S.W.3d at 596; *In re Angela E.*, 303 S.W.3d at 246. Under Rule 13(d), appellate courts review factual findings de novo on the record and accord these findings a presumption of correctness unless the evidence preponderates otherwise. *In re Bernard T.*, 319 S.W.3d at 596; *In re M.L.P.*, 281 S.W.3d 387, 393 (Tenn. 2009); *In re Adoption of A.M.H.*, 215 S.W.3d 793, 809 (Tenn. 2007). In light of the heightened burden of proof in termination proceedings, however, the reviewing court must make its own determination as to whether the facts, either as found by the trial court or as supported by a preponderance of the evidence, amount to clear and convincing evidence of the elements necessary to terminate parental rights.

*In re Bernard T.*, 319 S.W.3d at 596-97. The trial court's ruling that the evidence sufficiently supports termination of parental rights is a conclusion of law, which appellate courts review de novo with no presumption of correctness. *In re M.L.P.*, 281 S.W.3d at 393 (quoting *In re Adoption of A.M.H.*, 215 S.W.3d at 810). Additionally, all other questions of law in parental termination appeals, as in other appeals, are reviewed de novo with no presumption of correctness. *In re Angela E.*, 303 S.W.3d at 246.

*In re Carrington H.*, 483 S.W.3d 507, 521-24 (Tenn. 2016) (footnotes in original but renumbered). Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Mother does not challenge two of the seven grounds found against her—persistent conditions and failure to manifest an ability and willingness to assume custody. Our Supreme Court, however, has instructed "that in an appeal from an order terminating parental rights the Court of Appeals must review the trial court's findings as to each ground for termination and as to whether termination is in the child's best interests, regardless of whether the parent challenges these findings on appeal." *In re Carrington H.*, 483 S.W.3d at 525-26 (footnote omitted). Therefore, we will review all seven of the grounds found against Mother.

Numerous grounds for termination of parental rights are at issue in this appeal. DCS filed its petition seeking to terminate Mother and Father's parental rights on June 22, 2020, and we apply the statutes regarding parental rights termination as they were in effect on that date. These grounds are set out as follows:

(g) Initiation of termination of parental or guardianship rights may be based upon any of the grounds listed in this subsection (g). The following grounds are cumulative and nonexclusive, so that listing conditions, acts or omissions in one ground does not prevent them from coming within another ground:

(1) Abandonment by the parent or guardian, as defined in § 36-1-102, has occurred;

(2) There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to title 37, chapter 2, part 4;

(3)(A) The child has been removed from the home or the physical or legal custody of a parent or guardian for a period of six (6) months by a court order

-23-

entered at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and:

(i) The conditions that led to the child's removal still persist, preventing the child's safe return to the care of the parent or guardian, or other conditions exist that, in all reasonable probability, would cause the child to be subjected to further abuse or neglect, preventing the child's safe return to the care of the parent or guardian;

(ii) There is little likelihood that these conditions will be remedied at an early date so that the child can be safely returned to the parent or guardian in the near future; and

(iii) The continuation of the parent or guardian and child relationship greatly diminishes the child's chances of early integration into a safe, stable, and permanent home;

(B) The six (6) months must accrue on or before the first date the termination of parental rights petition is set to be heard;

***

(14) A parent or guardian has failed to manifest, by act or omission, an ability and willingness to personally assume legal and physical custody or financial responsibility of the child, and placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child;

Tenn. Code Ann. § 36-1-113 (Supp. 2020).

The following definitions of abandonment are at issue on appeal:

(1)(A) For purposes of terminating the parental or guardian rights of a parent or parents or a guardian or guardians of a child to that child in order to make that child available for adoption, "abandonment" means that:

(i) For a period of four (4) consecutive months immediately preceding the filing of a proceeding, pleading, petition, or any amended petition to terminate the parental rights of the parent or parents or the guardian or guardians of the child who is the subject of the petition for termination of parental rights or adoption, that the parent or parents or the guardian or

guardians either have failed to visit or have failed to support or have failed to make reasonable payments toward the support of the child;

(ii)(*a*) The child has been removed from the home or the physical or legal custody of a parent or parents or guardian or guardians by a court order at any stage of proceedings in which a petition has been filed in the juvenile court alleging that a child is a dependent and neglected child, and the child was placed in the custody of the department or a licensed child-placing agency;

(*b*) The juvenile court found, or the court where the termination of parental rights petition is filed finds, that the department or a licensed child-placing agency made reasonable efforts to prevent removal of the child or that the circumstances of the child's situation prevented reasonable efforts from being made prior to the child's removal; and

(*c*) For a period of four (4) months following the physical removal, the department or agency made reasonable efforts to assist the parent or parents or the guardian or guardians to establish a suitable home for the child, but that the parent or parents or the guardian or guardians have not made reciprocal reasonable efforts to provide a suitable home and have demonstrated a lack of concern for the child to such a degree that it appears unlikely that they will be able to provide a suitable home for the child at an early date. The efforts of the department or agency to assist a parent or guardian in establishing a suitable home for the child shall be found to be reasonable if such efforts equal or exceed the efforts of the parent or guardian toward the same goal, when the parent or guardian is aware that the child is in the custody of the department;

***

(iv) A parent or guardian is incarcerated at the time of the filing of a proceeding, pleading, petition, or amended petition to terminate the parental rights of the parent or guardian of the child who is the subject of the petition for termination of parental rights or adoption, or a parent or guardian has been incarcerated during all or part of the four (4) consecutive months immediately preceding the filing of the action and has:

(*a*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child for four (4) consecutive months immediately preceding the parent's or guardian's incarceration;

-25-

(*b*) Failed to visit, has failed to support, or has failed to make reasonable payments toward the support of the child during an aggregation of the first one hundred twenty (120) days of non-incarceration immediately preceding the filing of the action; or

(*c*) Has engaged in conduct prior to incarceration that exhibits a wanton disregard for the welfare of the child; or….

***

(B) For purposes of this subdivision (1), "token support" means that the support, under the circumstances of the individual case, is insignificant given the parent's means;

(C) For purposes of this subdivision (1), "token visitation" means that the visitation, under the circumstances of the individual case, constitutes nothing more than perfunctory visitation or visitation of such an infrequent nature or of such short duration as to merely establish minimal or insubstantial contact with the child;

(D) For purposes of this subdivision (1), "failed to support" or "failed to make reasonable payments toward such child's support" means the failure, for a period of four (4) consecutive months, to provide monetary support or the failure to provide more than token payments toward the support of the child. That the parent had only the means or ability to make small payments is not a defense to failure to support if no payments were made during the relevant four-month period;

(E) For purposes of this subdivision (1), "failed to visit" means the failure, for a period of four (4) consecutive months, to visit or engage in more than token visitation. That the parent had only the means or ability to make very occasional visits is not a defense to failure to visit if no visits were made during the relevant four-month period;

(F) Abandonment may not be repented of by resuming visitation or support subsequent to the filing of any petition seeking to terminate parental or guardianship rights or seeking the adoption of a child;

***

(H) Every parent who is eighteen (18) years of age or older is presumed to have knowledge of a parent's legal obligation to support such parent's child or children;

(I) For purposes of this subdivision (1), it shall be a defense to abandonment for failure to visit or failure to support that a parent or guardian's failure to visit or support was not willful. The parent or guardian shall bear the burden of proof that the failure to visit or support was not willful. Such defense must be established by a preponderance of evidence. The absence of willfulness is an affirmative defense pursuant to Rule 8.03 of the Tennessee Rules of Civil Procedure;

(J) For purposes of this subdivision (1), a period of incarceration lasting less than seven (7) consecutive days must be counted as days of non-incarceration; and

(K) For purposes of this subdivision (1), aggregation is accomplished by counting the days preceding, following, and in-between each period of incarceration of at least seven (7) consecutive days;

Tenn. Code Ann. § 36-1-102 (Supp. 2020).

Should grounds for termination be found, courts apply the following non-exclusive statutory factors to determine whether termination of parental rights is in a child's best interest:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113(i) (Supp. 2020).

Beginning with Father's issues, we first address whether the Juvenile Court erred in finding the ground of failure to visit. The relevant timeframe for this ground is February 22, 2020 through June 21, 2020. Father argues that factors beyond his control contributed to his not regularly visiting the Child during that time. Father notes transportation issues, finances, and work schedule conflicts. Father also notes that in May 2020, the Child tested positive for COVID and in-person visitation was rendered impossible. Finally, Father asserts that the Child's "developmental delays and special needs…[made] video and phone visitation more difficult than it normally would be with a child of his same age." The Juvenile Court found, and the record reflects, that Father failed to visit the Child during the period at issue. Father simply called "randomly." While the Child's COVID positive test certainly excused Father from visiting in its aftermath, Father failed to make full use of the means of contact that were still available to him. Furthermore, that excuse does not justify Father's failure to visit at other times when COVID restrictions did not prevent him from doing so. DCS points out that Father failed to file an answer raising the affirmative defense

-28-

of lack of willfulness.  Under the applicable statutory scheme in effect for this case, Father was required to prove by a preponderance of the evidence that his failure to visit the Child was not willful.  He failed to do so.  The evidence does not preponderate against the Juvenile Court's findings relative to this issue, and Father's excuses for failing to visit the Child from February 22, 2020 through June 21, 2020 are unavailing.  We find, as did the Juvenile Court, that the ground of failure to visit was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to provide a suitable home.  As relevant to this ground, the Child was removed from Father's custody.  The Child was adjudicated dependent and neglected, and the Juvenile Court found that DCS made reasonable efforts to prevent the Child's removal.  The Juvenile Court found further that, in the four months following the Child's removal, Father completed a mental health assessment in July 2019 but declined an appointment in August 2019 to complete his alcohol and drug assessment.  In addition, the Juvenile Court found that Father failed to complete in-home services during those four months following removal.  Father also incurred new criminal charges.

With respect to DCS's reasonable efforts, the Juvenile Court found that DCS conducted child and family team meetings; provided in-home services; helped the parents complete anger management, domestic violence and parenting classes; referred the parents for mental health and alcohol and drug assessments; provided them with gas cards for transportation to visit the Child; and provided ongoing advice and recommendations.  The evidence does not preponderate against these factual findings made by the Juvenile Court.  In his brief, Father concedes he made little progress early in the case, but states he later obtained reliable transportation; reinstated his driver's license; held steady work; completed mental health and alcohol and drug assessments; participated in IOP, group therapy, and medication management; and completed domestic violence and parenting classes.  Father takes issue with DCS's efforts, citing a lack of communication.  Father points to the episode whereby he was confused as to whether he was to take a hair follicle drug test or a nail test.

Father is correct in that he eventually acted on or completed certain of the tasks he was required to do.  However, this ground calls for an examination of parental conduct in the four months following the Child's removal.  Father's efforts to establish a suitable home—one safe from substance abuse and domestic violence—in the relevant time period were paltry.  Father rightly acknowledges as much.  In addition, Father's touting of his completion of domestic violence classes is not of particular moment considering his subsequent conduct involving domestic violence.  Father did not make the necessary effort to establish a suitable home for the Child in the relevant four month period following removal despite DCS's reasonable efforts, nor indeed had Father done so as of trial.  We

find, as did the Juvenile Court, that the ground of failure to provide a suitable home was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. In support of his argument that this ground was wrongly found against him, Father states that he complied with the permanency plan by doing the following: (1) completed assessments and followed recommendations; (2) passed a random drug screen in October 2020 and attempted to submit to a hair follicle screen; (3) completed domestic violence and parenting classes; (4) maintained contact with DCS; (5) reinstated his driver's license; (6) signed necessary releases; (7) obtained stable housing; (8) obtained legal source of income; (9) visited the Child; and (10) paid child support. In its order, the Juvenile Court noted that Father failed to complete the STOP program; resides with a paramour who has pending drug charges; and has been arrested five times since the Child was placed into DCS custody.

It is true that by trial, Father had complied with or was attempting to comply with several of his responsibilities under the permanency plan. A parent need not necessarily accomplish every goal set out in the statement of responsibilities in a permanency plan; the question for purposes of this ground is whether that parent is in substantial noncompliance with the permanency plan. In the present case, the bases for the Child's removal were substance abuse and domestic violence in the home. The permanency plan was developed to address those twin issues. The record shows that Father continued to use methamphetamine and engage in domestic violence well after the Child's removal. These instances of noncompliance with Father's responsibilities under the permanency plan were not a mere matter of failing to check the right boxes; they went to the heart of the reason for the Child's removal. The evidence does not preponderate against the Juvenile Court's findings relative to this issue. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of persistent conditions. The Child was removed from the family home and Father's legal custody in May 2019, the termination petition was filed in June 2020, and the trial was held in October 2020. Thus, as required under this ground, more than six months elapsed from removal. Father argues that DCS failed to prove that his substance abuse or domestic violence issues persisted. Father noted that Mother no longer lives with him and there are no allegations of Father being violent toward Jennifer F. Father's arguments are unpersuasive. Father testified bluntly at trial about his methamphetamine use: "I don't do it that much. I just do it every now and again." This present-tense answer does not reflect that Father has remedied his substance abuse issue or that his substance abuse is a thing of the distant past. Trial was held in October 2020; Father testified he used methamphetamine as recently as

-30-

early 2020. Regarding domestic violence, Father testified it was no longer a problem because Mother no longer lived with him, the implication being she somehow drove him to it before. This testimony reveals a lack of personal responsibility on Father's part and a "blame the victim" mentality. Most extraordinarily of all, Father assaulted Mother after having completed domestic violence classes the month before. The evidence does not preponderate against the Juvenile Court's factual findings as to this ground; the conditions necessitating the Child's removal still exist with Father and show no sign of relenting. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Father by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. With respect to this ground, our Supreme Court has explained that "[i]f a person seeking to terminate parental rights proves by clear and convincing proof that a parent or guardian has failed to manifest either ability or willingness, then the first prong of the statute is satisfied." *In re Neveah M.*, 614 S.W.3d 659, 677 (Tenn. 2020) (emphasis in original). The second prong of the statute requires us to consider whether placing the child in the person's legal and physical custody would pose a risk of substantial harm to the physical or psychological welfare of the child.

With regard to the first prong of this ground, the Juvenile Court found that Father has a long history of domestic violence and substance abuse issues. These ongoing issues render Father unable to responsibly care for the Child or to assume custody of him. Although a finding of either inability or unwillingness is sufficient to satisfy the first prong of this ground, for completeness we also consider the Juvenile Court's finding that Father was unwilling as well as unable to assume custody of the Child. Father certainly has expressed a desire to assume custody, but his stated willingness is hollow in light of his continued behavior during the custodial period. Like the Juvenile Court, we find that Father failed to manifest either the willingness or ability to assume legal and physical custody of the Child.

As to the second prong of this ground, the Juvenile Court found that placing the Child in Father's custody would pose a risk of substantial harm to the Child's psychological and physical welfare. The record reflects that the Child requires routine and stability. He has special medical needs. Father's ongoing proclivity for substance abuse and domestic violence are incompatible with the Child's well-being. The second prong of this ground is met as well. The evidence does not preponderate against the Juvenile Court's findings. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Father by clear and convincing evidence.

-31-

The final issue concerning Father we address is whether the Juvenile Court erred in finding that termination of Father's parental rights is in the Child's best interest. In his brief, Father makes the following argument as to best interest:

Assertions made in addressing whether TPR was in the child's best interest simply were not accurate. Appellant argues that forever separating the child from his biological parents is not in his best interest.

Continued substance abuse issues and criminal activity, failure to provide suitable housing, and failure to maintain contact with the child are the prevailing reasons asserted in discussing the best interest factors. As argued herein, these assertions were simply not accurate or were misleading. Appellant [Father] did not continue to have substance abuse issues, he had no recent criminal charges other than driving on a suspended license in the four months prior to the filing of the petition, he provided proof of suitable housing, and he attempted to the best of his ability to maintain contact with his child who was placed several hours away from his home.

We disagree with Father's characterization of the evidence. Father's sworn testimony was that he uses methamphetamine "every now and again." Father has committed multiple domestic assaults upon Mother while under the influence of methamphetamine. Father assaulted Mother a month after completing domestic violence classes, which strongly suggests he learned nothing. To be sure, certain of the best interest factors do favor Father. Father works, has paid child support, and has an appropriate home—at least in terms of its physical space. Father began visiting the Child more regularly in the months before trial, as well. Nevertheless, Father still has not successfully addressed his substance abuse or domestic violence issues—the very issues that led to the Child's removal in the first place. Meanwhile, the Child resides at a facility that looks after his special needs. The Child is not in a foster family or pre-adoptive home. In that sense, the facility is a less than ideal placement as permanency would be best. Even still, this current placement attends to the Child's special needs for structure and routine. Based on this record, Father is unable to provide that kind of stability. Holding out for Father to address his longstanding substance abuse and domestic violence issues, which show no significant sign of abating, can serve only to prevent the Child from obtaining a more ideal placement. The evidence does not preponderate against the Juvenile Court's findings in connection with its best interest analysis. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Father's parental rights is in the Child's best interest.

Turning to Mother's issues on appeal, we first address whether the Juvenile Court erred in finding the ground of failure to provide a suitable home. Mother argues that, given

her circumstances, she made reasonable efforts to provide a suitable home. Mother observes that she was incarcerated in July 2019, two months after the Child's removal and one month after her arrest for failure to appear for a shoplifting charge. Mother notes that once she was released from jail, she quickly found a job and eventually found stable housing. The Juvenile Court found that DCS made reasonable efforts to help Mother in the four months following the Child's May 22, 2019 removal into state custody. The Juvenile Court found further that Mother made scant effort of her own to provide a suitable home during that time. The evidence does not preponderate against the Juvenile Court's findings.

We agree with Mother that her incarceration during part of the period at issue is a relevant factor in our analysis. An incarcerated parent obviously is limited in what he or she can do to secure a suitable home. However, incarceration during the relevant timeframe is not an *ipso facto* justification for a parent's failure to take such actions that they still are able to take. Mother's excuses for failure to act on providing a suitable home are unavailing. Even viewing Mother's actions up through trial in this matter, she has never yet successfully addressed her substance abuse problem. Mother used illegal drugs three weeks before trial. Mother's ongoing substance abuse issue is directly contrary to her ability to provide a suitable home for the Child. We find, as did the Juvenile Court, that the ground of failure to provide a suitable home was proven against Mother by clear and convincing evidence.

At this juncture, we note that DCS on appeal concedes two grounds with respect to Mother: abandonment by failure to visit by incarcerated parent and abandonment by failure to support by incarcerated parent. Upon our review of the record, DCS's concessions are appropriate as these grounds were not proven by the requisite clear and convincing evidence. We reverse the Juvenile Court in its finding against Mother the grounds of abandonment by failure to visit by incarcerated parent and abandonment by failure to support by incarcerated parent.

We next address whether the Juvenile Court erred in finding the ground of wanton disregard. Mother argues that a "failure to appear charge that invokes a violation of probation should not be what takes a Mother's child away." If that were the total evidentiary basis for this ground, Mother's argument might be persuasive. However, the ground of wanton disregard permits courts to consider a parent's conduct prior to incarceration exhibiting wanton disregard for the child's welfare—it is not limited to the conduct that immediately caused the incarceration. The Juvenile Court found that Mother has engaged in "criminal conduct, violating probation, using illegal drugs…." In our judgment, this pattern of conduct found by the Juvenile Court rises to the level of wanton disregard by Mother for the Child's welfare. The evidence does not preponderate against

-33-

the Juvenile Court's findings. We find, as did the Juvenile Court, that the ground of wanton disregard was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of substantial noncompliance with the permanency plan. The Juvenile Court found, among other things, that Mother used THC, methamphetamines, and Suboxone as recently as three weeks prior to trial. The Juvenile Court found further that Mother still relied on public transportation; failed to provide proof of an alcohol and drug or mental health assessment; and was involved in domestic violence incidents in November 2019. Mother notes that she "took classes while she was incarcerated, submitted to a mental health assessment and a drug and alcohol assessment while incarcerated, and once she was no longer incarcerated, she paid child support and visited the Child." Mother states further that, while she has had relapses, she "was attempting to stay clean, and had been drug-free for three weeks at the time of trial." Mother did, in fact, attempt to comply with the permanency plan in certain areas. After getting out of jail, Mother quickly found work, paid child support, secured housing, and visited the Child. Regrettably, Mother's efforts have not resulted in her successfully addressing her substance abuse issue. As found by the Juvenile Court, Mother failed to provide proof that she completed a drug and alcohol assessment and a mental health assessment. Mother used illegal drugs three weeks before trial. Mother's failures to act effectively toward remedying her substance abuse issue constitute gross noncompliance with the permanency plan.

Turning to the matter of domestic violence, the record reflects that Mother has been assaulted multiple times by Father. Contrary to Father's testimony, in no sense is Mother responsible for Father's violence. Nevertheless, Mother is responsible for her own acts of violence, and she testified to hitting Jennifer F. in November 2019.

Thus, in the areas of substance abuse and domestic violence—the two most significant barriers to Mother parenting the Child—Mother failed to make meaningful progress under the permanency plan, and the fact that Mother has complied with her responsibilities elsewhere does not alter that fact. The evidence does not preponderate against the Juvenile Court's findings as to this issue. We find, as did the Juvenile Court, that the ground of substantial noncompliance with the permanency plan was proven against Mother by clear and convincing evidence.

Mother does not challenge the ground of persistent conditions, but we review it all the same. The Juvenile Court found, as pertinent to this ground, that Mother used THC, methamphetamine, and Suboxone three weeks before trial. The Juvenile Court found further that Mother continued to be involved in domestic violence episodes after the Child's removal. The Juvenile Court found, ultimately, that the conditions which led to the Child's removal persisted. Upon our review of the record, the evidence does not preponderate

against the Juvenile Court's factual findings. We find, as did the Juvenile Court, that the ground of persistent conditions was proven against Mother by clear and convincing evidence.

We next address whether the Juvenile Court erred in finding the ground of failure to manifest an ability and willingness to assume custody. Mother does not challenge this ground either. We, however, still must address it. The Juvenile Court found that Mother has a long history of substance abuse that has not been resolved and that she has continued to have domestic violence issues. The Juvenile Court found that, as a result, Mother has failed to manifest an ability and willingness to assume legal and physical custody of the Child. Mother's ongoing substance abuse renders her unable to assume custody of the Child. Notwithstanding this, Mother has asserted her willingness to assume custody of the Child. Mother's actions undermine her stated desire. We note there is a distinction between loving one's child, which is not in dispute here, and demonstrating a willingness to do the things necessary to assume custody of that child. We find, as did the Juvenile Court, that the first prong of the ground was satisfied.

As to the second prong, the Juvenile Court found that placing the Child in Mother's custody would pose a risk of substantial harm to the psychological and physical welfare of the Child. The Juvenile Court found that the Child, who is autistic, requires a higher level of care than most children, and that Mother cannot provide the stability or sobriety the Child needs. The evidence does not preponderate against this or any of the findings made by the Juvenile Court relevant to this ground. We find, as did the Juvenile Court, that the ground of failure to manifest an ability and willingness to assume custody was proven against Mother by clear and convincing evidence.

The final issue we address is whether the Juvenile Court erred in finding that termination of Mother's parental rights is in the Child's best interest. In support of her contention that termination of her parental rights is not the Child's best interest, Mother argues that she and the Child share a strong bond; that severing this relationship would be detrimental to the Child; and that there is no foster home ready for the Child and at age 15, it will be difficult to find one. The record does reflect that Mother and the Child are bonded. However, we note DCS caseworker Baird's testimony that the Child does not ask for more contact with Mother, or indeed either parent, and the contact he does have with them is relatively infrequent. With regard to the fact the Child is not in a foster home, it is true this arrangement is less than ideal. Nevertheless, the facility where the Child lives offers routine and stability. Mother has not shown she can provide either routine or stability given her ongoing substance abuse. To her credit, Mother has visited the Child, secured housing, paid child support, and established a bond with the Child. However, these factors are overwhelmingly eclipsed by Mother's failure to address her longstanding substance abuse

issue. We find by clear and convincing evidence, as did the Juvenile Court, that termination of Mother's parental rights is in the Child's best interest.

## Conclusion

The judgment of the Juvenile Court is affirmed, in part, and reversed, in part, the result being that we affirm the termination of Mother and Father's parental rights to the Child. The costs on appeal are assessed against the Appellants, Nicole M. and Joseph M., and their surety, if any.

_____
D. MICHAEL SWINEY, CHIEF JUDGE